This is case number 4-14-0644, Natural Resources Defense Council v. Illinois Pollution Control Board. Attorney Alexander is here on behalf of the appellant. And attorneys Deeb and Maggio for, let's see, one of you must be representing them. Your Honor, Tim Maggio on behalf of the EPA Pollution Control Board. Okay. And Mr. Deeb here for Energy. Okay, gotcha. All right. Let's see. Ms. Alexander, are you ready to proceed? Yes, I am. All right. You may do so. Good morning, Your Honors. Good morning. Counsel. May it please the Court. Anne Alexander from the Natural Resources Defense Council on behalf of appellants. I would like to start this morning with a brief overview of the overarching issues at stake in this appeal before I move on to my two main points. The state agencies and the permittee in attempting here to rationalize an inadequate permitting decision are staking out positions that are not only contrary to law, but that would have far-reaching negative consequences for both Illinois' environment and for the integrity of its Delegated Clean Water Act permitting program. On the substantive question at issue on this appeal, which concerns Illinois EPA's obligation to require best available technology to control the discharge of mercury from the Dynegy Havana plant to the Illinois River, the respondents are effectively staking out a position that any new technology that comes along for use at a coal-fired power plant, no matter what it is, no matter what it does, and most importantly, no matter how much toxic pollution it may generate, gets a free pass from technology-based regulation under the Clean Water Act. And this, despite the relentless and very clear requirements in the Clean Water Act that pollution control measures need to keep pace with developing technology. Now, on the procedural question that we have before us today, which concerns Illinois EPA's obligation under its own regulations to respond to comments received from the public in issuing a permit, the respondents here want to render that obligation in IEPA's regulations permanently  I thought there were new regulations being drafted, or have been drafted. You're referring down to the first issue, I assume, the ELG. Yes. Yes, that is in fact the case, because the way these effluent limitation guidelines regulations work is they are serial, so there is a new one that has been drafted. What we are talking about is the requirement of what happens in the gaps, in the gap between one regulation and the other. We have one that's proposed. It is slated to be finalized this fall, and that means that three years from that date, in other words, presumably September of 2018, those regulations will kick in. Now the problem is, you have a current permit that allows this discharge without technology-based regulation to the Illinois River. That permit will be renewed in the year, well, there will be a renewal application, rather, I should say, in 2017, which is before that regulation kicks in. Now historically in Illinois, there is quite a long gap, often years, sometimes as long as a decade before a new permit is actually issued. So you have the problem that this permit that has been issued today, even though there is a new regulation coming on to be effective three years later, you will have a long period of time when you have this uncontrolled through technology-based regulation discharge to the Illinois River, and that is exactly why the Clean Water Act regulation, specifically at our key regulation here, 40 CFR 125.3, requires a case-by-case evaluation. When you don't have coverage for one of these gap periods to determine what is the necessary or what is the best available technology to control that discharge. So that's what we have here, and this gap is why it's so important. But isn't there argument, there's no evidence that there's a discharge that's harmful, and with the monthly required monitoring, if there was discharge of mercury that wasn't found, the permit could be withdrawn? That's actually a very key point. I'm glad you brought that up because there's an important distinction here you have to keep in mind. I want you to bear with me because this is just slightly technical, but as you may recall, there were essentially two different parts to our appeal. One of those parts had to do with what we call water quality-based standards. And the idea is that the permitting agency is supposed to look at what is the current water quality and what is being discharged, and then you make a determination as to whether that discharge is going to harm water quality. Now, we will freely admit, we did below, that if you're going to make that determination, the first thing you need to know is what's in the effluent. And in that sense, what we were disagreeing with below was, well, how do you tell? If you have evidence from another plant, is that sufficient? We said it was. They said it wasn't. We haven't appealed that. So that was an issue below. The decision was with respect to these water quality-based limits, yes, you need to have monitoring and monitoring makes sense. Now, what you'll notice in the Board's decision below is on the technology-based aspect, the Board didn't say anything about monitoring. And the reason is because monitoring has nothing to do with it because it's a totally different legal standard. When you're dealing with technology-based limits, the requirement kicks in whenever there may be, not is, but may be a discharge that is larger than can be controlled by existing technology. That is clearly met here. We have a situation where regardless of any doubts as to exactly how much was coming out, the permitting agency did conduct review as though there were going to be a discharge. They described it as minimal and not all that significant and nothing to worry about, which of course concerned us because mercury is regulated in the parts per trillion. But be that as it may, the point being there really isn't any dispute here and there certainly wasn't anything in the Pollution Control Board's decision that suggested any dispute as to whether there was enough for the technology-based limit to kick in. Now, US EPA, accordingly, has repeatedly said it doesn't, you don't get to address TBEL's technology-based effluent limits with monitoring. They said that in the Tennessee decision that I pointed out to you. The applicant had said, well, we're really not quite sure what's coming out here. And EPA said no. In a technology-based limits decision, the only question is whether the pollution is coming out at a higher level than can be controlled. And here, you've got a situation where, in the record, there was essentially acknowledgement by Illinois EPA that it was technically feasible to reduce the discharge to zero. Because what you do is you put it in a dry ash landfill and then there is no discharge by definition. And in fact, in this 2013 effluent limitation guideline EPA confirms, you can reduce the discharge to zero. So clearly you have a situation where there's no need for monitoring. Monitoring isn't relevant because we know that the pollutant may be discharged at a level that can be controlled down to zero. So I want to move on a little bit to what I think is a very important point here, which is the nature of the technology that we're talking about. The fundamental question, issue, when we're talking about this question of whether the technology that's being used to control mercury at the dynergy plant, the fundamental question is whether that is something that is covered by this 1982 ELG. Now put into terms specifically of the regulation, which at 125.3c states that you need to do a case-by-case limit for any aspect or activity in addition to any pollutant that's not covered. The question then becomes whether ACI is an aspect or an activity that was covered in 1982 or is it not? Now the answer to that question is really very straightforward. Given that ACI technology would not even exist until three decades after this 1982 ELG was covered by the 1982 ELG under the terms of this regulation. And I want to stop here and emphasize, because this is important, that the court really does not need to go beyond that basic logic in order to decide this. You don't need to additionally consider the questions having to do with scrubbers. It may be helpful as emphasis, but you really don't need to go there because right there we have this fact that ACI could not have been covered because it didn't exist. Now the reason we're still talking about scrubbers here today is because the board did. The board specifically relies on a reference to scrubbers in the effluent limitation guideline as a basis for its decision. But this reference really reflects some pretty fundamental confusion on the part of the board as to what exactly we're talking about here, which in turn is a pretty fatal flaw. The board was essentially mixing up this activated carbon injection technology, which is very new, and it's designed to collect mercury and hence creates a very large mercury waste stream, in this case up to 0.6 pounds going into the ash pond, which then discharges to the river. They're mixing that up with old school scrubber technology. Now a scrubber is something that did exist in some form in 1982. It's designed specifically to capture sulfur dioxide, and the only reason it is coming up in this context is that in the process of capturing sulfur dioxide it also pulls in some mercury. So there's a little bit of a mercury discharge. But these are two very different things. Now this is a big problem with respect to the decision below because the board based its decision on what it called the plain language of the 1982 ELG, but in fact the plain language only mentions scrubbers. It does not mention activated carbon injection. And the board never explained, because there really is no good explanation, how a reference to scrubbers could bring in ACI. Now given the significance of this error, I've noted that respondents really have not relied heavily on the board's specific reasoning there. What they're really presenting is a broader take on the concept of plain language, which is the same one, incidentally, that the coal plant defendants raised in the Kentucky Waterways case, which went our way. But their take is essentially that because the 1982 ELG contains the definition of low volume waste, and this definition is essentially a catch-all and includes everything that is not otherwise regulated, since therefore any new technology necessarily falls into the catch-all, therefore, because it is part of this definition, it is regulated under the 1982 ELG, QED, we're done here. There are several major problems with that approach that I want to point out. I think it falls apart under limited scrutiny. The first is that it would render the key provision here, 125.C3, meaningless, because that provision clearly contemplates that there will be aspects of an effluent limitation guideline from EPA that don't cover certain aspects or activities. But the argument being proffered here is no, absolutely everything is covered across the board except these tiny limited exceptions in it. One would have to have a pretty high level of evidence in the text that wiping away a regulation in this nature was intended. But what we have, when we look at what EPA has done and said, is really pretty much exactly the opposite intention. It is very clear from EPA's statements that they intended not to include at least some aspects of coal plant operation in this regulation. In other words, that just because this low volume waste catch-all definition existed, that didn't mean they were regulating the toxics that might fall within it. It just is a definition. I will get into in a moment, if need be, EPA's statements about the exclusion of scrubbers, but the point being they have said many times over the years that they did not mean to incorporate everything. Now, I would also point out, it is important to note, when you look at the plain language as a whole, as I think I noted a minute ago, this regulation does not, the 1982 ELG contains no regulations for the toxic elements of low volume waste. They don't set best available technology limits, which is what you have to do when you have a toxic pollutant. Because they didn't do that, they didn't regulate a toxic, they did not regulate toxics, arguably the plain language is really pretty clear in exactly the opposite direction of what the board said it was. The plain language indicates that mercury from pollution control equipment is not regulated, but at the very least it's very ambiguous, and you have to turn to what EPA has actually said. Well, they considered regulating mercury, didn't they? And isn't that a key point? Yes, it is in fact a key point, because the question there is what does considered mean and what is the significance of the permit writer's handbook, because that's what they're referring to. What they're essentially saying there is that the permit writer's handbook, which provides very general guidance for how you determine what's covered, has as a piece of that guidance the question whether or not EPA considered a pollutant. Two important things I think to keep in mind there. First of all, of course, it is broad general guidance that you use when you don't know whether an ELG covers something. Here we have a clear statement from EPA that no, these aspects of coal plant operation are not covered. So you don't need to read any tea leaves by looking at this general guidance. But I think the more important point even is what you're really saying when you look at it that way. Because here we know, it's very clear in our briefs and I won't belabor it, EPA has said again and again we did not mean to cover these aspects. We meant to reserve them, they're not covered, so do your case by case. So what you're really doing is you're setting up a gotcha scenario for the agency. What you're saying is even if that was your intention, if you decided for whatever technical discretionary agency reasons that you're going to look at something and say we are going to reserve regulation of that and not cover it, too bad, aha, you thought about it, you don't get to do that, therefore you did cover it whether you wanted to. That is a very serious form of undercutting EPA's discretion. And I don't think we want to go there. I think that what you want to bear in mind is that this question of whether EPA considered a particular pollutant is only the very beginning of an inquiry where you don't have more information. Because first of all, bear in mind that the regulation 125.3C doesn't just talk about considering pollutants, it talks about considering aspects or activities of operations. So even if you know that they thought about a pollutant, the question is did they consider it in the context of this particular aspect or activity? Because as we know with ACI, some activities are going to generate vastly more of a pollutant than other activities. So even if they considered mercury in the context of scrubbers and the small amount that generates, they certainly didn't consider ACI as an activity. So that's the beginning. And then the other part of the inquiry is what did they decide when they consider it? Did they decide that regulation was not necessary? They may have, in many cases, EPA, and as they did here, will look at something and say that pollutant doesn't exist, or if it looks like it did, it was laboratory error, or that pollutant will be controlled when we control this pollutant. That's one thing they can do when they consider. But what they can also say is what they actually did here is we've considered it and we've decided that the technology for controlling it is still emerging. It is not sufficient right now to control it to the place where we need to control it. Therefore, we are going to reserve regulation and not cover it. And EPA has been very clear that that is exactly what they did. Now, if there are no further questions, I don't know if there are on the ACI technology issue, I would like to move on to the second issue of EPA's regulation. Now, before getting into this in detail, I want to talk a little bit about the significance, legally and otherwise, of the public comment response requirement. Public comment is, of course, central to the Clean Water Act. Its framers talked about the need to make decisions in what they called a fishbowl-like atmosphere. So this is front and center. And a response to public comments is a critical part of the response to comments requirement for at least three reasons. One is that if you require an agency to respond, you know that they are not going to throw the comments into the round file. Secondly, a response to comments requires an agency to think through its position. And in doing so, it may well change its position. You really have to assume that or you are essentially saying that the comment process is just sort of window dressing. And it also enables decisions on appeal because you know the agency's position and you can know then whether or not you need to appeal and if so, how to frame it. So there's a very real judicial economy component there. Now, Dynegy is essentially responding to this with a claim of, well, no harm, no foul because the issues have been briefed and everybody therefore knows so we can go away. We're done here. A couple of real problems with that. First of all, as I have pointed out, there is very real harm associated with not receiving a response to comments both in terms of the possible change in substantive outcome and in terms of the appellate process. But I would also point out that even if you take it at face value, there is a real, what they're really arguing is mootness. And if you're talking about mootness, then you're also talking about capable of repetition yet evading review. This is a situation where the same problem is going to come up again and again with the same people, us, the environmental community. We will not receive response to comments and yet when we appeal, the appeal will be briefed and the issue will go away. So one way or the other, I think that we need to deal with it here. And then finally, just to touch on the state's argument, if I could, it is simply not accurate as they have alleged that we did not address the significant comments language below. We clearly did. It's in our briefs. We'll have more time on rebuttal. Okay. Let's see, who's going first? Mr. Deeb? All right. You may proceed. May it please the court. Counsel. My name is Daniel Deeb. I'm here today representing Dynagy, the permittee. Let me start by dispelling any notion as referenced by Ms. Alexander that the discharges in question, as you pointed out, Your Honor, do not entail more pollution to the environment. They simply do not. There is no increased loading. That was the specific finding of the board in the underlying proceedings, that the discharges from a ban in question do not represent an increased loading to the environment. Petitioners contested that issue before the board. The board sustained it, and there was not further appeal. It is thus no longer a dispute, I submit, as to whether or not these discharges entail increased pollution. They do not. With that point made, I'll turn to my first argument, ELG applicability. The parties appear to fundamentally agree that a central question before you is whether the current ELG applies to the abandoned station discharges at issue. If the answer to that question is yes, it is undisputed that the IEPA properly acted not to impose a case-by-case T-belt. So, how does one determine whether the current ELG applies to the abandoned station discharge? Because all parties agree that EPA is to be afforded significant deference in interpreting its own rules, we suggest that EPA's view as to how to determine ELG applicability should carry the day. As petitioners' moral argument and briefs make clear, EPA has written to this topic a variety of times, sometimes inconsistently. I'll try to address each of those writings. I'll begin with the 2012 NPDES Permit Writer's Manual, the most recent and relevant guidance with a very precise, specific issue at hand, how to determine if an ELG is applicable in a given situation. The 2010 manual conveys a relevant part at section 5232, titled Identifying the Need for Case-by-Case T-belts, as follows. When effluent guidelines are available for the industry category, but no effluent guideline requirements are available for the pollutant of concern, the permit writer should make sure that the pollutant of concern was not considered by EPA when the agency developed the effluent guidelines. With this guidance in mind, it is clear that EPA believes the question at hand is simply whether the metals in question were considered in the development of the ELG. As detailed in our brief, it is beyond reasonable dispute that EPA considered these metals when it developed the ELG. As reflected in the preamble of the ELG, EPA carefully studied the metals and concluded that such were present in amounts too small to be effectively reduced by technologies known to the administrator. What about their argument that ACI wasn't even in existence back then, in 1982? The argument turns to what's relevant? A pollutant assessment or a technology assessment? Or excuse me, a waste stream assessment. The EPA's guidance calls for an assessment of the pollutant. Was the pollutant considered? Not whether the technology in question was considered. It is that simple. And so one might ask, why? I submit that it's because an effluent guideline, the process is designed to establish effluent limits for pollutants. So it's a pollutant-specific analysis. That's exactly what the EPA's guidance calls for, is you have to look at the pollutants. Now, I'll also submit that because the waste streams in question, the catch-all nature of the low-volume waste definition, is written broadly, including but not limited to, it's forward-looking. That includes activities that were yet to be developed. I'll add, by the way, that it's very unusual for an effluent guideline to have that kind of a catch-all. It's a situation where every other effluent guideline I've looked at, there are 58, I believe, everyone I've ever looked at, maybe 15 or 20, has no catch-all like that. This is a situation where EPA has provided for a low-volume waste to be expansive. But moreover, I'll come back to the point that the issue is a pollutant. The EPA's guidance specifically calls for a pollutant assessment, not an assessment about technology. I'll add that the approach posited by the 2010 manual, i.e. not mandating case-by-case T-bells when EPA has already considered a pollutant, is good policy. It would be illogical and heavily burdensome to require a state-permitting agency to do the very difficult task of establishing a T-bell when such was already unsuccessfully attempted by EPA. This may be especially true in a situation when we are months away from a new ELG that will, in most respects, move this issue. With respect to Mrs. Alexander's comment that the ELG will take time to be effective, that may be true. We don't know the final rule, what its effective period will be. It was suggested that it might be three years in the proposed rule. We don't know if that will be the case. But I will say also that if IEPA is forced to do its own case-by-case T-bell, the time period will probably be just as long. It is an incredibly difficult and arduous procedure to perform a T-bell. There's no reason to expect that that process, if IEPA somehow has to do their own, would somehow supersede in time the process of the foregoing federal regulations. And I'll also note that the national approach to T-bells is far superior in that it establishes a level playing field for the industry. The analysis required by the 2010 manual, I submit, is consistent with the conclusion of the EPA's most recent writing on this topic, its 2013 proposed new ELG. As explained in our brief, the 2013 proposed rule stated that the proposed discharges now at issue, ACI wastewater, is currently included in the existing ELG as a low-volume waste source. It very specifically says that. So, to repeat, the most recent writing from EPA on this very topic expressly and unambiguously says that the current ELG applies to the Havana waste stream in question. It applies. I submit that should end the analysis. Okay, wait, the current ELG, are they talking about the 1982? Yes, ma'am. Okay, so could you say that one more time? The current ELG, in its discussion, says expressly that, and I'll just quote, flue gas mercury controlled wastewater, which is defined to include ACI waste stream specifically, is currently included under the definition of low-volume waste sources. They're trying to take a different approach with the new rule, but they acknowledge it's currently captured. And that's IEPA saying that, or U.S. EPA? U.S. EPA. So, what are the guidelines for the discharge of mercury? I'm sorry? What are the ELGs for the discharge of mercury? There is not currently an effluent guideline applicable to, excuse me, there is not a, the effluent guideline applies to low-volume waste sources, of which this particular ACI waste stream are a part of. There is not a mercury effluent limitation established for that today. And that's common. Effluent limitations are not established by EPA for all aspects of the waste stream. And today they have not. Now that will be, and all expectations are a part of the new rule. The proposed rule identified eight options as per, which is also unusual if the water rule says, hey, what are these eight ways? So, yeah, to cut through all this, this is a little difficult for me, but mercury was considered in 1982. Correct. And upon consideration of the discharge of mercury, it was decided that there would be no limitations. Correct. For the discharge of it, because there just wasn't enough known at that time? Yes, Your Honor. Okay, it seems odd. You said that's commonplace, though. It is. Okay. It is. And that's why effluent guidelines are supposed to be periodically reviewed and updated. As technologies change, they will update them and provide better information. So every 30 years? There can be no defending the fact that it took a long time in this situation. I will point to the dissent of the Kentucky Waterways decision, however, which respectfully suggested that his colleagues in the majority substituted their judgment of Hart over overhead and suggested that it was not the province of the court in his view to allow the regulatory void to be filled by Was that the dissent in the Kentucky case? Correct. And the Tennessee case is a trial court from Tennessee. That is correct. And by the way, I'll add that I understand both cases, both the Tennessee and Kentucky to be subject to further appeal. The Tennessee, I think, has already been appealed and counsel for the Kentucky has advised that they will be appealing as well. But clearly, one of those cases is completely contrary to the other. Absolutely, sir. The Tennessee Waterways case is exactly the analysis we believe is appropriate for this scenario. The Kentucky case I will respectfully submit where the majority simply said this that the reliance placed by the court on the majority upon the permit manual was misplaced because it was at odds with the purpose of the Clean Water Act to restore our nation's water. Would it be fair to say that the dissent in the Kentucky case is consistent with the trial court's order in the Tennessee case? Yes, sir. Okay. I'm just asking. I wanted to make sure I read them correctly. Thank you. Let me briefly address the two regional comment letters that were at issue. Petitioners give way to a 2011 comment letter from EPA Region 4 concerning a Tennessee power plant. That Region 4 comment letter stated that a case-by-case T-bill was needed. Exactly the position they're advocating here today. I've got three points I'd like to make about this letter. First, Region 4 has no jurisdiction in Illinois. Region 5 controls Illinois. Region 5 positions was made clear in a comment letter to the Havana permit, which I'll discuss shortly. Second, the Tennessee agency disputed the Region 4 comment letter and backed very generously. That fact is probably made clear to you by the Tennessee Clean Water Network case we just discussed. In that case, it's clear that the current law in Tennessee now holds that a case-by-case T-bill is not needed with respect to these issues, contrary to the position that the Regional letter took. And finally, I'll add that the Region 4 letter did not mention or address ACI wastewater. Only FGD wastewater. With these points in mind, respectfully suggest that no weight whatsoever should be attributed to that Region 4 letter. Far more relevant is the 2012 EPA Region 5 comment letter specifically concerning the draft Havana permit. Region 5 offered substantial comments on other issues. It made no objection whatsoever to the draft permit omission of a case-by-case T-bill to discharge in question. Petitioners complained that EPA's very comments on the issue should not be given any weight. That, I would remind that consistent with the objection authority of Clean Water Act 402 D2B, section 3 of the NPDES memorandum agreement between Illinois and US EPA provides that Illinois may assume that US EPA has no objection to a proposed permit term if no objection is received within 90 days. Dynagy thus respectfully submits that the Region 5 letter specifically concerning the Havana legislation should be viewed as indicative of Region 5's belief that a case-by-case T-bill was not required for Havana. With respect to the reservation of rights in the preamble text which petitioners tout, I'll simply say that that reservation has no value. It simply says what is always true. EPA is always free to revise, issue new ELGs. With respect to the Helen memo, I'll point out that the 2010 manual is more recent, as is the 2014 Region 5 comment letter and the 2013 proposed ELG. All are also, in my view, far more specific and address ACI, which the Helen memo does not. I'll also suggest that the Helen memo was mistakenly predicated upon the preamble reservation of rights. Lastly, very briefly, with regard to our second argument, that regardless of the current ELG's applicability, we submit that the petitioner's claim should be rejected because 125.3c affords discretion, not the duty, to undertake a case-by-case eval. It uses the word may. Now, it says may and I fully agree that may applies to subparts 1, 2, and 3. However, parts 1 and 2 become mandatory because they're specifically required also by the Clean Water Act. So those two provisions are mandatory no matter how you slice it. The third provision, C, which is the one at issue here today, C3, nothing makes that mandatory. It is discretionary in that it says may. And the preamble text supports that. The preamble text, which has not been addressed by a respondent, says, for example, even if this regulation does not control a particular pollutant, the permit issuer may still limit such pollutant on a case-by-case basis. Again, may still limit this pollutant on a case-by-case basis. Thank you. Thank you, counsel. Mr. Baggio? Good morning, Your Honors. I'm Assistant Attorney General. This morning, as I indicated earlier, I represent the Illinois EPA and the Illinois Pollution Control Board. Your Honors, in my brief time here, I would just like to make three small points, if I may. First, there's no reason in this case  administrative commentary, like the Hanlon Memo, about what the U.S. EPA intended to do with its regulations in 1982. We have a clear regulation and clear historical fact. And I'm a generalist lawyer, but here's what I think we know. One, the regulation is extraordinarily broad and comprehensive. Low-volume wastewater is a catch-all, and it covers everything, including every stream of water other than sanitation and air-conditioning water. Historical fact two, in 1982, we know exactly what the EPA wanted done with mercury. In 1982, mercury and, by the way, everyone agrees on this fact. In 1982, the U.S. EPA says, one, we know that mercury is present in the south flow, and two, it's present in amounts so small that, given the technology, there's nothing that can be done about it, and so we do not want to regulate it. We have no regulation to be involved. And so in 1982, let's take our 1982 snapshot. In 1982, we know that the U.S. EPA was telling us that they know mercury is there, and that states when you write your permits, you don't need to put any effluent level in there for mercury. Now, the petitioners say, well, the world's different now. Right? But sometime between then and now, there's new technology. And what they, I think they spotted somewhere around 2006, 2009, in that frame, neck of the words, right? And that now there's new technology that makes it more feasible to get mercury out. And so they say we need a new rule. But that's just exactly what's happening right now. Everybody agrees that the U.S. EPA is working on, has drafted, and in fact has published a proposed new regulation. They proposed it in 2013. We're given to understand that they plan to, I think it's the court order in Defenders of Wildlife and Sierra Club versus McCarthy, that they're going to publish final regulations in three months. So the world is going exactly as it's supposed to go. In 1982, the U.S. EPA tells us they know there's mercury, and you don't put an effluent limit in there. And the states wrote their permits accordingly. In 2015, if the U.S. EPA gives us a new regulation and says we have new or different effluent levels, well then we'll go ahead, the Illinois EPA and Pollution Control Board will adjust their permits accordingly. How long is this permit good for? The permit's good for five years, Your Honor, as I understand it. The permit in this particular case was issued in 2012, had an effective date of 2012, and I think it gets renewed in 2017, if I recall correctly. So if the U.S. EPA comes out with these more restrictive regulations, can the Illinois EPA and the Pollution Control Board require Dynagy to start complying with the regulation before this permit expires? Your Honor, I believe it's actually special condition 4 in the permit, if you want me to get the chapter verse, if I may just go back to the table for a second. Yeah, special condition 4 of the permit provides that if while the permit is existent, there are new effluent levels, or the U.S. EPA comes up with new guidelines, then the agency, in this case, then has the authority to adjust the permit accordingly. Are they mandated to do that? They are. They are, Your Honor. I believe they are. Counsel, would it be fair to say that the U.S. EPA currently interprets the 1982 ELG to already regulate ACI discharges as low volume waste? Yes. Yes. Okay, so how can this... Because the current regulation covers low volume wastewater, which is the catch-all, if I understand you, Your Honors. So the flow is there, and then the separate question is whether there's a regulation for the particular toxin. And they told us in 1982 they know mercury is there, but the amount is too small. And my point was that simply, if what we're talking about is how do we move from there to now, where do we get the new rule, and who comes up with the new rule? That's what's critical here. We get the new rule, and who comes up with the new rule by the U.S. EPA. And the U.S. EPA is the one that's in the process and has done a lengthy report. The new regulations are quite extensive, and they're months away from adopting final ones we're given, to understand. And when that's the case, if that's the case, and when those come online, then we'll adjust our permits accordingly. So, Your Honors, I'm out of time. If I may have one minute more? I'll give you one minute more. Just one minute, Your Honors. If it were the case that it's relevant to know what the U.S. EPA thinks today, that we have to take up to the minute, we know, as counsel suggested, we know in this case, with respect to this permit, with respect to this plant, what they wanted to do. They sent a letter. They were given the draft permit. The draft permit talks all about that. The draft permit's clear that they're giving no affluent limitations. And what does the U.S. EPA say? We will not object to the issuance of the permit as drafted. So we don't need to guess about the Hanlon memo and guess about this thing and this interpretive guide and that interpretive guide. We're told. We're told. And lastly, with respect to the response from the summary, in our brief, there is a federal decision that we have cited that we believe addresses the issue appropriately and has an appropriate abuse of discretion, arbitrary and capricious standard. That if somebody comes in and complains about a response to the summary but they don't demonstrate that the permitting agency acted arbitrarily or capriciously in how they selected what comments to respond to, because this really, in fact, is the issue. You respond to all, you know, 150 comments you make or can you select 75 of the most significant ones? Unless they demonstrate there's an abuse of discretion, there's nothing, there's no adjudicative issue there. Your Honor, I thank you very much for the extra time. I appreciate it. Ms. Alexander, if you need an extra minute, I'll give it to you too. Thank you. I appreciate it. So, let me try to clear up some things that have been said here. First of all, Mr. Deeb began by making the point that the Board purportedly found that there would be no increased discharge. That simply is not accurate. I would like to call your attention, I won't read it all here, but to page 39 of the Board's decision, 686 in the record, where what the Board clearly said is we don't have enough information, but the Board did know that the IEPA had acted on the assumption that there would be an increased discharge of mercury. So what you have here is exactly the situation that the regulations at issue are trying to address, where you may have an increased discharge of a very toxic pollutant and you have a long gap in regulation where you don't have any regulations based on technology for discharge of that pollutant into Illinois waters. And that is why this is important, that's why we're here. Now secondly, I would like to clear up what Mr. Deeb said to the effect that the real issue is whether a pollutant was considered as opposed to an activity. Again, I can't emphasize this enough, the need to look at the regulation itself. What Mr. Deeb was quoting from was this handbook, which contains general guidance for permit writers in thinking about these issues. But the regulation at issue, 125.3c states that you will need to impose controls through a combination of an effluent limitation guideline and case-by-case T-bill, specifically when promulgated effluent limitation guidelines only apply  discharger's operation, or to certain pollutants. Other aspects or activities are subject on a case-by-case basis in order to carry out provisions of this Act. EPA in these regulations could not have been clearer that where ELGs not only don't cover every pollutant, but don't cover certain aspects or activities that you need a case-by-case T-bill in the gaps to deal with exactly the situation where something new comes along that is not regulated in the ELG, even though it covers the industry. Now, why would U.S. EPA approve the permit then? That is an interesting question. What we have here is a situation where U.S. EPA was simply silent. And quite frankly, to be perfectly honest, that happens a lot is that U.S. EPA doesn't always catch every issue. And that's why we have these permit appeal processes. But I think what you have to do I don't know how you can say they were silent. Didn't they recommend monthly testing instead of quarterly testing? But that, as I explained, the testing does not have anything to do with the T-bills issues because they're completely different regulatory schemes. They were entirely silent on this question as to whether a case-by-case technology-based limit is required for mercury. Now, what you have here is a higher... But they didn't object to the issuance of the permit. How can you call that total reticence? It's silence in the sense that what you have is a hierarchy of authority. You've got a regulation that clearly says a case-by-case determination needs to be made for something that is not covered. And then what you have is statements by EPA headquarters as directive to the region saying, and I have the quotation here. There's really no question what they said. They said that the 1982 rulemaking did not establish best available control technology limits for FGD scrubber wastewaters because EPA lacked the data necessary. So they were very clear that they did not mean to cover it at the headquarters level. Now, the fact that this was missed at the regional level is really not the key question here. The key question is what does the regulation require and whether it was done? Agencies miss things all the time, and that is why we have these permit appeal processes to see whether the law was complied with. And clearly it was not here. Now, I would point out that this regulation has been characterized as forward-looking and comprehensive. In the law, of course, we have many situations where regulations are designed to be comprehensive, whether or not something has come along or not. This is not one of those situations. If you look at the key regulation here, it contemplates circumstances where an aspect or activity was not covered because it didn't exist. And in the 2013 draft, US EPA says exactly the same thing. On the one hand, they say, sure, this falls within the definition of low-volume waste, but that doesn't mean it's covered because they describe ACI, mercury-laden waste, as a new waste stream that simply was not dealt with in 1982. And that is why we have 125.3C is to address situations like that where something was not covered and we need to protect the environment from a highly toxic pollutant. You're at the last minute, just so you know. Oh, okay. Sorry. I'll just say one thing quickly on the last point from the state then, which is that it's simply inaccurate to say that we did not raise the question of whether our comments were significant or not. We most certainly did. It is clearly in our briefs, our main and our reply brief, and I would add that even the board did not take seriously the notion that an issue that took up fully one-third of our very detailed and elaborate comments and was supported by law and fact laid out at great length was somehow not significant. We laid out the standard of review that we still believe applies. If IEPA had a concern with that, they could have raised it below, and they did not. Thank you. Thank you, counsel. We'll take this matter under advisement to stand and recess.